```
1                   IN THE UNITED STATES DISTRICT COURT

2                   IN AND FOR THE DISTRICT OF DELAWARE

3                              -  -  -

4    PFIZER INC. and UCB PHARMA GMBH,)     Civil Action
                                     )
5                   Plaintiffs,       )
                                     )
6         v.                          )
                                     )
7    ALKEM LABORATORIES LTD., et al.,)
                                     )         NO. 13-1110(GMS)
8                   Defendants.       )      CONSOLIDATED

9                              -  -  -

10                       Wilmington, Delaware
                     Tuesday, November 18, 2014
11                        9:30 a.m.
                       Markman Hearing
12                             -  -  -

13
     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14
     APPEARANCES:
15
             JACK B. BLUMENFELD, ESQ.
16           Morris Nichols Arsht & Tunnell LLP
                  -and-
17           JAMES S. TRAINOR, JR., ESQ.,
             JEFFREY J. OELKE, ESQ.,
18           RYAN JOHNSON, ESQ., and
             ROBERT E. COUNIHAN, ESQ.
19           White & Case LLP
             (New York, NY)
20
                            Counsel for Plaintiffs
21

22
:22:24
:33:40  23

24

25
```

1    APPEARANCES CONTINUED:

2            JEFFREY CASTELLANO, ESQ.
             Shaw Keller LLP
3
                         Counsel for Defendant
4                        Alkem Laboratories Ltd.

5            DAVID E. MOORE, ESQ.
             Potter Anderson & Corroon LLP
6                   -and-
             KEVIN P. BURKE, ESQ.
7            Rakoczy Molino Mazzochi Siwik LLP
             (Chicago, IL)
8
                         Counsel for Defendant Apotex
9
             ADAM W. POFF, ESQ.
10           Young Conaway Stargatt & Taylor LLP
                    -and-
11           KRISTEN VINK VINEGAS, ESQ.
             McDermott Will & Emery LLC
12           (Chicago, IL)

13                       Counsel for Defendant Sandoz Inc.

14           DOMINICK T. GATTUSO, ESQ.
             Proctor Heyman, LLP
15                  -and-
             STEVEN J. MOORE, ESQ.
16           Kelley Drye & Warren LLP
             (Stamford, CT)
17
                         Counsel for Defendant Zydus
18                       Pharmaceuticals (USA) Inc.

19           KELLY E. FARNAN, ESQ.
             Richards, Layton & Finger, P.A.
20                  -and-
             MICHAEL R. DZWONCZYK, ESQ., and
21           CHANDRAN B. IYER, ESQ.
             Sughrue Mion, PLLC
22           (Washington, D.C.)

23                       Counsel for Defendant/
                         Counterclaimant Accord
24                       Healthcare Inc., USA and
                         Defendant Amneal Pharmaceuticals,
25                       Inc.

1    APPEARANCES CONTINUED:

2                J. CLAYTON ATHEY, ESQ.
                Prickett, Jones & Elliott, P.A.
3                        -and-
                WILLIAM D. HARE, ESQ., and
4                GABRIELLA MATERASSI, ESQ.
                McNeely, Hare & War LLP
5                (Princeton, N.J.)

6                                Counsel for Defendants
                                Amerigen Pharmaceuticals, Inc.
7                                and Amerigen Pharmaceuticals Ltd.

8                JOHN C. PHILLIPS, JR., ESQ.
                Phillips, Goldman & Spence, P.A.
9                        -and-
                JAMAICA P. SZELIGA, ESQ.
10               Leydig, Voit & Mayer, Ltd.
                (Washington, D.C.)

11                               Counsel for Defendant Lupin

12               JOHN M. SEAMAN, ESQ.
13               Abrams & Bayliss LLP
                        -and-
14               CHAD LANDMON, ESQ.
                Axinn, Veltrop & Harkrider LLP
15               (Hartford, CT)

16                               Counsel for Defendant Hetero

17               BENJAMIN J. SCHLADWEILER, ESQ.
                Seitz Ross Aronstam & Moritz LLP
18
                                Counsel for Defendants and
19                               Counterclaimants Wockhardt Bio
                                AG and Wockhardt USA, LLC
20

21                               -  -  -

22

23

24

25

| | | |
|---|---|---|
| :33:40 | 1 | THE COURT:  Good morning.  Please, take your |
| :33:42 | 2 | seats. |
| :33:43 | 3 | We have only one term.  Right? |
| :33:46 | 4 | MR. BLUMENFELD:  Correct, Your Honor. |
| :33:48 | 5 | THE COURT:  Mr. Blumenfeld. |
| :33:53 | 6 | MR. BLUMENFELD:  Good morning, Your Honor.  Jack |
| :34:03 | 7 | Blumenfeld from Morris Nichols for Pfizer and UCB.  Along |
| :34:07 | 8 | with me at counsel table, James Trainor, Ryan Johnson, Bob |
| :34:15 | 9 | Counihan, and Jeffrey Oelke, all from White & Case.  Mr. |
| :34:17 | 10 | Trainor will be doing the plaintiffs' presentation this |
| :34:19 | 11 | morning, with Your Honor's permission. |
| :34:22 | 12 | Sitting in the back of the courtroom in the |
| :34:25 | 13 | second row is Stephane Drouin and Jurgen Hassa, who are here |
| :34:30 | 14 | from UCB.  In the row behind them, Chase Romick, who is with |
| :34:35 | 15 | Pfizer. |
| :34:39 | 16 | THE COURT:  Thank you, Mr. Blumenfeld. |
| :34:39 | 17 | Ms. Farnan. |
| :34:39 | 18 | MS. FARNAN:  Good morning, Your Honor.  Kelly |
| :34:41 | 19 | Farnan from Richards, Layton & Finger on behalf of the |
| :34:44 | 20 | defendants Accord and Alkem.  I am joined by my co-counsel |
| :34:47 | 21 | from Sughrue Mion Michael Dzwonczyk.  Mr. Dzwonczyk is going |
| :34:51 | 22 | to make the presentation on behalf of the plaintiffs today. |
| :34:54 | 23 | Also on behalf of Accord and Alkem from Sughrue Mion is |
| :34:58 | 24 | Chandran Iyer. |
| :35:00 | 25 | THE COURT:  Good morning. |

|  |  |  |
|---|---|---|
| :35:01 | 1 | Do any other defendants want to be on the |
| :35:04 | 2 | record? |
| :35:04 | 3 | MR. MOORE:  Good morning, Your Honor.  David |
| :35:06 | 4 | Moore from Potter Anderson representing Apotex.  From |
| :35:09 | 5 | Rakoczy Molino is Kevin Burke. |
| :35:10 | 6 | THE COURT:  Good morning. |
| :35:10 | 7 | Mr. Phillips. |
| :35:11 | 8 | MR. PHILLIPS:  Good morning, Your Honor.  Jack |
| :35:13 | 9 | Phillips on behalf of Lupin.  With me in the back of the |
| :35:16 | 10 | courtroom is Jamaica Szeliga from the Leydig firm in |
| :35:20 | 11 | Washington, D.C. |
| :35:21 | 12 | MR. POFF:  Good morning, Your Honor.  Adam Poff |
| :35:24 | 13 | on behalf of Sandoz.  With me is Kristen Venegas from |
| :35:31 | 14 | McDermott Will & Emery.  And from Sandoz, Brian Hurst. |
| :35:34 | 15 | THE COURT:  Good morning, counsel. |
| :35:35 | 16 | MR. GATTUSO:  Good morning, Your Honor. |
| :35:35 | 17 | Dominick Gattuso from Proctor Heyman.  I have with me Mr. |
| :35:40 | 18 | Steve Moore from Kelley Drye on behalf of Zydus |
| :35:40 | 19 | Pharmaceuticals. |
| :35:44 | 20 | THE COURT:  Good morning, counsel. |
| :35:44 | 21 | MR. SCHLADWEILER:  Good morning, Your Honor. |
| :35:46 | 22 | Ben Schladweiler from Seitz Ross on behalf of Wockhardt. |
| :35:50 | 23 | THE COURT:  Good morning, counsel. |
| :35:53 | 24 | MR. CASTELLANO:  Good morning, Your Honor. |
| :35:53 | 25 | Jeffrey Castellano from Shaw Keller on behalf of Alkem. |

:35:59    1          **MR. ATHEY:  Good morning, Your Honor.  Clayton**

:36:02    2  **Athey from Prickett, Jones & Elliott on behalf of Amerigen.**

:36:04    3  **With me today is William Hare of McNeely, Hare & War.  Also**

:36:09    4  **Gabriela Materassi.**

:36:17    5          **MR. SEAMAN:  Good morning, Your Honor.  John**

:36:18    6  **Seaman from Abrams & Bayliss on behalf of Hetero.  With me**

:36:22    7  **from Axinn, Veltrop & Harkrider LLP is my colleague, Chad**

:36:28    8  **Landmon.**

:40:01    9          **THE COURT:  Good morning.**

:40:02   10          **There is not much to talk about.  Just one term.**

:40:07   11  **So, plaintiffs, what are you doing?**

:40:09   12          **MR. TRAINOR:  Your Honor, I have some copies of**

:40:10   13  **our slides.  If I may approach?**

:40:13   14          **THE COURT:  Yes, please.**

:40:32   15          **MR. TRAINOR:  Good morning, Your Honor.  James**

:40:40   16  **Trainor of White & Case on behalf of the plaintiffs, Pfizer,**

:40:44   17  **Inc. and Alkem Labs, Ltd.**

:40:50   18          **Your Honor, this is a Hatch-Waxman patent**

:40:54   19  **infringement case against ten defendants presently.  Our**

:40:56   20  **understanding is two of the defendants, Hetero and Hetero**

:41:00   21  **Labs, do not join in the dispute that is before the Court**

:41:04   22  **this morning.**

:41:06   23          **Your Honor, there are five patents in this**

:41:09   24  **lawsuit.  Four of those patents are not at issue today.**

:41:12   25  **Those four patents, which we have previously referred to in**

| | | |
|---|---|---|
| :41:18 | 1 | the proceedings of this case as the compound patents, are |
| :41:20 | 2 | shown on the top of the slide there.  The patent at issue |
| :41:24 | 3 | today is the '650 patent, or what we refer to as the salt |
| :41:27 | 4 | patent.  That is shown at the bottom of the slide there. |
| :41:32 | 5 | One important thing to know about the |
| :41:33 | 6 | relationship between the patents in suit, the four compound |
| :41:37 | 7 | patents at the top of the slide are in the same patent |
| :41:40 | 8 | family.  That is, they are related, they claim priority |
| :41:43 | 9 | through common priority applications. |
| :41:46 | 10 | The '650 patent is not related to the compound |
| :41:50 | 11 | patents.  However -- and this is quite important -- the |
| :41:55 | 12 | compound patents are not prior art to the '650 patent.  That |
| :42:00 | 13 | is contrary to the statements repeatedly in the defendants' |
| :42:04 | 14 | briefing that there is prior art, prior art applications to |
| :42:09 | 15 | the '650 salt patent, which is a priority application to the |
| :42:13 | 16 | compound patents. |
| :42:16 | 17 | So the reason why it is not prior art -- it is a |
| :42:18 | 18 | little bit involved -- but it's clear that under no section |
| :42:22 | 19 | of 102 do the compound patents or any of the priority |
| :42:25 | 20 | documents qualify as prior art.  The defendants cite no |
| :42:30 | 21 | legal basis to the contrary. |
| :42:33 | 22 | Very briefly some background, for pertinent |
| :42:36 | 23 | context in the dispute here about the '650 patent. |
| :42:40 | 24 | The '650 patent is entitled Stable Salts of |
| :42:48 | 25 | Novel Derivatives of 3,3-Diphenylpropylamines. |

:42:48  1  3,3-diphenylpropylamines are the general class of compounds.

:42:52  2  And specifically claimed in Claim 1 is a subgenus of those

:42:57  3  diphenylpropylamines that are referred to as phenolic

:43:04  4  monoesters.  Formula I of Claim 1 are various salts of the

:43:07  5  genus of phenolic monoesters from the patent.

:43:12  6          As you can see, Claim 1 is a traditional,

:43:15  7  straightforward chemical compound claim and nothing more.

:43:18  8  This claim is defined entirely by chemical structure, and we

:43:23  9  submit is unambiguous to a person of ordinary skill in the

:43:26  10  art, whether that is organic chemistry, salt chemistry, or

:43:29  11  what have you.

:43:33  12          There are also 24 claims in the '650 patent.

:43:36  13  Nine are asserted against the defendants presently, although

:43:39  14  we are in the process of trying to narrow that number.  Of

:43:42  15  course, again, only one is at issue today.

:43:46  16          The '650 patent begins, from its outset,

:43:51  17  explaining that there are three inventions in this patent.

:43:56  18  Right in Column 1 it states that the inventions are salt

:44:00  19  compounds themselves, separately a method for manufacturing

:44:04  20  those salt compounds, and additionally a method for

:44:07  21  manufacturing intermediate compounds which are used along

:44:11  22  the way in the synthesis process that may ultimately lead to

:44:14  23  the salt.

:44:15  24          I should note that a species of the Claim 1

:44:19  25  compounds is the sodium phenol monoester salt fesoterodine

:44:26  1   fumarate.  That is the active pharmaceutical ingredient of

:44:29  2   the accused product in this case.

:44:37  3           Very briefly, Your Honor, of these three

:44:40  4   inventions, salts are the key invention here.  In the course

:44:43  5   of the development of what became the accused product in

:44:47  6   this case, what the inventors observed was that the

:44:49  7   free-base form of this genus of compounds exhibited less

:44:56  8   than ideal stability and it made it less than an ideal

:44:59  9   candidate as a practical drug candidate.  A solution to

:45:03  10  that, if it could be done, was to try to convert those

:45:06  11  compounds to salt forms so they could be more available for

:45:09  12  use in a pharmaceutical application.

:45:12  13          Once the inventors discovered that, they also

:45:15  14  discovered separately a method for manufacturing those

:45:18  15  salts, and specifically, and separately, a method for

:45:22  16  manufacturing the particular intermediate products, and

:45:24  17  particularly, the particular intermediate that we refer to

:45:29  18  as the free base, or the base compound, which is essentially

:45:33  19  the starting materially for making the salt.  Due to some

:45:39  20  efficiencies in the manufacturing process, the process as

:45:42  21  disclosed here in the defendants' '650 patent, that renders

:45:45  22  a good yield of pure sodium compounds and free-base

:45:50  23  compounds that enable the manufacturer to make the drug.

:45:53  24  Once again, three separate inventions:  the salts

:45:57  25  themselves, a method for manufacturing them, and an

:45:59  1    intermediate product, all separately disclosed, all

:45:59  2    separately claimed.

:46:07  3             This slide shows representative claims in the

:46:10  4    patent to these delineated inventions.  Claim 1 is

:46:15  5    representative of the compounds claims, the claims to the

:46:17  6    salt compounds themselves.  Of course, Claim 1 is the claim

:46:21  7    in dispute today.  Separately, in the middle, you have Claim

:46:24  8    7.  Claim 7 is an independent claim to a method of

:46:30  9    manufacturing the salts of Formula I.  That is, Claim 7 is a

:46:33  10   method of manufacturing the compounds of Claim 1.

:46:37  11            On the right-hand side, we have Claim 18.  Claim

:46:41  12   18, also an independent claim.  Claim 18 relates to the

:46:45  13   separate third invention, the method of manufacturing the

:46:47  14   intermediate compounds.  What is depicted there is a

:46:51  15   free-base form of the ultimate intermediate compound prior

:46:55  16   to making the salt.  That is Claim 18.

:46:58  17            So three sets of claims directed to three

:47:00  18   different inventions.

:47:06  19            Turning now to the parties' competing

:47:09  20   constructions of Claim 1, on the left side of the slide you

:47:12  21   have Claim 1 as it issued.  As Your Honor knows, the

:47:15  22   plaintiffs submit this claim is entitled to its plain and

:47:17  23   ordinary meaning.  As I said before, this is a

:47:19  24   straightforward chemical compound.  The only language in

:47:23  25   this compound comprises chemical structure.  And the only

:47:26    1    limitations are chemical structures that can be substituted

:47:29    2    at the R and X positions of the formula.  There is nothing

:47:33    3    ambiguous about this claim.

:47:35    4        By contrast, on the right, we have defendants'

:47:40    5    construction.  Even to the untrained eye, we can see that

:47:43    6    that construction looks nothing like Claim 1 as it issued

:47:46    7    and as it would be viewed by the public, where we have to

:47:51    8    evaluate whether or not they infringe.

:47:54    9        Even the depicted structure, the depicted

:47:56    10    molecule used in the defendants' construction is quite

:47:59    11    different from the molecule in Claim 1 as it issued.  That

:48:05    12    particular molecule is actually a different intermediate

:48:08    13    product, lead products upstream from the ultimate salt

:48:12    14    that's claimed in Claim 1.

:48:15    15        A reading of the defendants' construction, it

:48:18    16    should be noted, does not result in a salt.  So the intent

:48:22    17    of the inventors with Claim 1, as is shown in the title of

:48:26    18    the patent, as shown in the disclosure, consistent with the

:48:28    19    chemistry, is to claim a salt.  Defendants' construction

:48:32    20    doesn't even lead one to a salt.

:48:35    21        A few other notes about defendants' proposed

:48:38    22    construction here on the right, Your Honor, it really sort

:48:42    23    of undermines the credibility of their position.  First of

:48:45    24    all, unlike your traditional claim construction case, the

:48:48    25    defendants are not trying to single out a phrase or

:48:50  1   particular claim term of Claim 1 and propose a construction

:48:55  2   for it.  Instead, they have rewritten the claim in its

:48:59  3   entirety.  There is no support cited by defendants for a

:49:02  4   construction of this nature.  That is a complete rewrite of

:49:06  5   the claim.

:49:07  6           In addition, you will notice at the top that

:49:09  7   this construction proposed by the defendants is not really

:49:12  8   tied to Claim 1.  It is a proposed construction for Claim 1,

:49:16  9   but it suggests that this governs all the claims that are

:49:20  10  disclosed in the '650 patent.  This is unconventional, to

:49:24  11  say the least.  And certainly the defendants don't cite any

:49:27  12  support for a construction of that nature.

:49:30  13          And finally and most importantly, at the crux of

:49:32  14  this matter, the use of the words "those obtained by" in

:49:36  15  defendants' proposed construction signal pretty clearly that

:49:39  16  the defendants intend to convert a straightforward chemical

:49:42  17  compound claim into an entirely different type of claim, and

:49:47  18  that is a product-by-process claim.

:49:58  19          The issue before the Court today, as it has been

:50:01  20  framed by the defendants, is whether the inventor of the

:50:04  21  '650 patent disavowed compounds made by any process other

:50:10  22  than the process that they import into their construction,

:50:13  23  and which is a process described in the '650 patent.  That

:50:19  24  is a process that they repeatedly referred to as the

:50:22  25  "special reaction" process or the "crucial" process.

:50:25    1          The proposal is that the inventor disavowed any

:50:29    2   other process, as we understand it.

:50:31    3          In fact, the relief that is sought here is

:50:33    4   really extreme, because it's more than just a disavowal

:50:37    5   case.  What the defendants need to overcome or what they

:50:42    6   invoke here are actually three separate exceptions that are

:50:45    7   well settled under the law of claim construction.  They are

:50:49    8   each separately treated in the law.  They each are not

:50:52    9   easily overcome.

:50:53   10          The first is the general prohibition on

:50:56   11   importing limitations into the claim, which, as Your Honor

:50:59   12   has probably heard many times, is one of the cardinal sins

:51:03   13   of claim construction.  That is generally what needs to be

:51:05   14   accomplished here.

:51:06   15          Separate from that, as we just discussed, the

:51:10   16   defendants invoke the very rare support for converting a

:51:17   17   product claim into a product-by-process claim.  That is

:51:21   18   separately treated.  That is sort of a separate analysis

:51:24   19   from the disavowal itself.

:51:26   20          So in this case, the defendants first have to

:51:29   21   justify importing a limitation into the claim; then they

:51:32   22   have to suggest that the claim language clearly triggers an

:51:37   23   indication that the claim, while not written as a process

:51:41   24   claim, should be treated as a process claim; and then the

:51:44   25   defendants will have to show that even if the claim should

:51:50   1   be construed that way, that there was a particular process

:51:52   2   that was clearly and manifestly disavowed.

:51:56   3            Those are very high hurdles to clear, each of

:51:59   4   them, and the defendants clear none of them.

:52:02   5            It should be noted with respect to these cases

:52:04   6   that talk about converting a product claim to a

:52:07   7   product-by-process claim that the purpose of

:52:11   8   product-by-process claims -- and this is enunciated by the

:52:14   9   Supreme Court in BASF, by the Federal Circuit in Atlantic

:52:17   10   Thermoplastics, and this District in the Biacore decision --

:52:20   11   product-by-process claims, the purpose of them is really to

:52:23   12   define a claim where they otherwise can't be defined, in

:52:27   13   other words, where a claim cannot be defined by structure.

:52:30   14            That is the polar opposite of the situation

:52:33   15   here, where Claim 1 is clearly defined by chemical

:52:40   16   structure.  There is absolutely no call for treating this

:52:43   17   claim as a product-by-process claim.

:52:45   18            Put simply, the premise of defendants' argument

:52:47   19   is as follows, again, as we understand it:  The salt

:52:50   20   compounds in the '650 patent have some beneficial

:52:53   21   properties.  According to the defendants, those salts were

:52:57   22   already in the prior art.  What they specifically point to

:53:02   23   is something referred to as the 212 PCT application.  Again,

:53:06   24   this is a priority application of the other compounds of the

:53:10   25   patent in suit that are not disputed here today.  They

:53:13　　1　　suggested these were prior art and they suggest these salts

:53:16　　2　　were already in the prior art.  Therefore, according to the

:53:19　　3　　defendants, the only way that the salt claims in the '650

:53:21　　4　　patent are patentable is if they are limited to this

:53:24　　5　　process, because if they were disclosed in the prior art

:53:27　　6　　already, the only way they could justify their validity is

:53:30　　7　　to limit them to a particular process, which, according to

:53:33　　8　　the defendants, is the only thing new in the '650 patent.

:53:41　　9　　　　　　Those premises are all resting on a number of

:53:45　　10　　assumptions, each of which is decidedly false.

:53:50　　11　　　　　　The first thing is that the defendants assume

:53:53　　12　　that, in fact, there was an inferior process in the prior

:53:55　　13　　art.  What they are suggesting is that the prior processes

:53:58　　14　　didn't result in the claims of this patent, and therefore

:54:01　　15　　you are limited to the process that is disclosed in this

:54:04　　16　　patent.

:54:05　　17　　　　　　In fact, there was no process in the prior art.

:54:08　　18　　The priority documents to the compound patent, the 212 PCT,

:54:13　　19　　is not prior art as a matter of law.  In addition,

:54:17　　20　　factually, there is a process disclosed in that 212 PCT

:54:22　　21　　application that they allege is prior art.  And that

:54:25　　22　　chemistry, that process, is the very same process that's

:54:27　　23　　disclosed in the '650 patent, which raises the question:

:54:32　　24　　What exactly are they disavowing?  The same process in that

:54:38　　25　　reference that the defendants point to.

:54:40    1          The defendants' premise also assumes that the

:54:43    2    properties of the salt, for example, the properties in the

:54:46    3    patent, the level of purity, the yield, the fact that it's

:54:50    4    in solid crystalline form, the defendants assume that all

:54:54    5    those properties are impacted by the process, that they are

:54:56    6    impacted or influenced by the intermediates that you use to

:55:00    7    get to the salt.  But no person of ordinary skill would ever

:55:03    8    suggest that that is the case, that the way or method that

:55:07    9    you get to the ultimate free base has no bearing on what the

:55:10   10    properties of the salt are.

:55:12   11          In addition, the argument assumes that Claim 1

:55:17   12    requires these properties.  But it doesn't.  If you look at

:55:20   13    Claim 1, Claim 1 is just simply to the salt.  It is not to a

:55:24   14    salt having certain purity, a salt in solution form, a salt

:55:28   15    in solid form, a salt giving way to certain yield.  None of

:55:33   16    that is required by the claim.

:55:34   17          The implication is you can't get good salts

:55:38   18    without using this process.  That assumes that the claim

:55:41   19    requires any of that.  And it does not.

:55:44   20          Finally, and critically, the defendants assume

:55:45   21    that the special reaction process that they repeatedly refer

:55:48   22    to in their briefing is actually linked to the salt

:55:53   23    compounds, it is actually linked to the claimed compounds,

:55:55   24    the claims for the compound themselves.

:55:57   25          That is not the case.  A fair reading of the

:55:59   1    specification makes very clear that to the extent that the

:56:02   2    special process is special at all or is linked to anything

:56:05   3    at all, it is linked to the method of manufacturing the

:56:08   4    salts and a method of manufacturing the compounds.  Again,

:56:11   5    separately disclosed, separately claimed inventions.

:56:16   6         No case that the defendants cite supports their

:56:21   7    position on claim construction.  But they are all very

:56:24   8    instructive because they set forth a very formulaic analysis

:56:29   9    that the courts routinely use when assessing whether

:56:32   10   disavowal has occurred, when assessing whether any product

:56:36   11   claim should be limited to a product-by-process claim.

:56:39   12        That is sort of a sequential review of the

:56:40   13   intrinsic evidence.

:56:42   14        The courts in these cases are looking for

:56:45   15   particular evidence, they are looking for particular facts

:56:47   16   with respect to each segment of the intrinsic evidence.  So

:56:54   17   we will cite to intrinsic evidence in turn.

:56:58   18        In contrast, with all of the decisions cited by

:57:00   19   the defendants, the claims here have no language that would

:57:04   20   suggest to the reader that any importation of any limitation

:57:08   21   is required.  Certainly, no language that suggests a process

:57:12   22   should be imported, and no language in the claims that

:57:14   23   suggests a disavowal in and of itself.

:57:18   24        Again, Claim 1 is entirely defined by chemical

:57:22   25   structure.  There is no other language in the claim other

:57:26    1    than the language of chemistry.

:57:28    2              So by contrast, you have these decisions, for

:57:31    3    example, the Andersen decision, which the defendants rely on

:57:38    4    heavily in support for the proposition of disavowal.  The

:57:42    5    Andersen claim that was at issue, one of the terms that was

:57:44    6    in the claim was the term "extrudate."  Extrudate is by

:57:49    7    definition a product by process.  Extrudate is some material

:57:54    8    that is extruded from an extrusion process.

:57:56    9              So the courts are looking for that kind of

:57:59   10    language, language that suggests there is an ambiguity,

:58:02   11    language that suggests there is something operational or

:58:06   12    functional about the claim, language that suggests certain

:58:08   13    properties of the claim are required to achieve or exhibit

:58:12   14    results.  None of that language is present in Claim 1 here.

:58:21   15              Courts also look to the other claims of the

:58:23   16    patent.  While Claim 7 is not asserted and no other claim of

:58:27   17    the '650 patent is at issue here today, it is important to

:58:31   18    consider that Claim 7 already claims, as we pointed out

:58:35   19    earlier, a method of manufacturing the very same compound of

:58:40   20    Claim 1.  The defendants by and large ignore this.  But

:58:45   21    what's relevant here is to sort of consider the fact that if

:58:50   22    you were to adopt defendants' construction, you would have

:58:52   23    to superimpose it over the claim.  That is what claim

:58:56   24    construction is.  I should be able to superimpose that claim

:58:58   25    construction over Claim 1 as they propose it.  If I do that,

:59:02     1    and sticking to the appropriate law and the proposition

:59:08     2    under the patent law that claim terms used across the patent

:59:10     3    are afforded the same meaning, what that means is Claim 7

:59:15     4    would read, A method of manufacturing compounds of General

:59:19     5    Formula I, which the defendants have now defined by its

:59:22     6    method of manufacture.

:59:23     7          So it would be a method of manufacturing a

:59:26     8    compound that is manufactured this way by the same

:59:29     9    manufacturing process.  It would be repetitive, superfluous.

:59:32    10    Claim 7 would read nonsensically.

:59:38    11          Next, the courts look to the specification, of

:59:41    12    course.  The language is pretty clear.  The standard is

:59:45    13    pretty clear across all the decisions cited by both parties

:59:48    14    that what the courts are looking for is a manifest, clear,

:59:53    15    unambiguous, surrender of claim scope.  This is seen by

:59:57    16    expressly exclusionary language somewhere in the

:59:59    17    specification.

:59:59    18          The cases cited by defendants hit on a couple of

:00:03    19    terms that the cases themselves sort of alluded to, when

:00:06    20    looking for terms like "essential," "applies to all

:00:09    21    embodiments," cases where the specification talks about "The

:00:13    22    present invention is" or "This invention is," followed by a

:00:18    23    limiting property."

:00:19    24          Probably the main case cited by the defendants

:00:22    25    in support of a disavowal with respect to the specification

:00:24   1   is the X2Y case.  In the X2Y case, in determining what kind

:00:30   2   of specification it was, what phrase, the feature was

:00:33   3   universal to all embodiments of the invention.

:00:38   4          Now, the '650 patent contains no such language.

:00:41   5   You can read it and confirm that.  It certainly contains

:00:45   6   none of that language with respect to or in connection with

:00:48   7   a special reaction process or a crucial process.  In fact,

:00:53   8   the only reference to any phrase remotely resembling those

:00:57   9   cases is the phrase "the present invention" or "the

:00:59   10   invention."

:01:00   11          In Column 2, right up front, the beginning of

:01:02   12   the '650 patent, the inventors uses that phrase, "The

:01:06   13   present invention is," "The present invention is the

:01:09   14   method," "The present invention is the salt," "The present

:01:12   15   invention is a method for providing for a high yield."

:01:16   16          When they are defining the present invention, we

:01:19   17   can see clearly we are talking about the invention as we

:01:22   18   described it before, a broad description of salts, a broad

:01:25   19   description of a method of manufacturing, a broad

:01:29   20   description of a method that provides for a high yield for

:01:32   21   the intermediate products.

:01:33   22          This is broad language signalling the inventor

:01:38   23   had no design on limiting the scope of his patent.

:01:41   24   Certainly, the word "special reaction process" or "crucial

:01:44   25   process" is nowhere near the reference to "the present

:01:48    1    invention" or "the invention."

:01:53    2         Defendants really base their entire argument on

:01:57    3    the reference to this special reaction process.  I think it

:02:00    4    appears something like ten times in their briefing.  In

:02:04    5    fact, it only appears twice in the patent.  Focusing on the

:02:13    6    passage of Column 9 of the patent, the defendants cite this

:02:15    7    passage, "In order to obtain the compounds in accordance

:02:15    8    with the invention in the form of their salts, the special

:02:21    9    reaction process via particular intermediate stages and

:02:23   10    individually identifiable intermediate products is crucial."

:02:29   11    This is the passage defendants cite from Column 9.

:02:32   12         The sentence begins, "In order to obtain."  This

:02:34   13    is the same language that is in the defendants'

:02:37   14    construction, which is a construction that proposes limiting

:02:40   15    to a process.  "In order to obtain" is signaling, I am about

:02:44   16    to tell you what my support is for my claims to the method

:02:48   17    of manufacturing process.  So the special reaction process

:02:52   18    is in reference to a description of that separately claimed

:02:57   19    invention, more particularly, the separately claimed

:03:00   20    invention of the process for manufacturing intermediates and

:03:04   21    the intermediate products.

:03:06   22         That is really a key distinction.  These are

:03:08   23    very different molecules.  There is no reference here or no

:03:11   24    suggestion that, whatever this process is, it is supposed to

:03:14   25    limit all salts that are covered by the claims of this

:03:16   1   patent.

:03:17   2               THE COURT:  Counsel, I am looking at that same

:03:20   3   column.  If the process is crucial for obtaining the

:03:25   4   compounds, couldn't that be construed as a clear disavowal?

:03:35   5               MR. TRAINOR:  I would suggest not, Your Honor,

:03:37   6   respectfully, because what is really crucial and special

:03:41   7   about this process has to do with the solvents that are used

:03:44   8   in the process and to make that final intermediate.  We had

:03:48   9   that reference in the passage of the third invention, which

:03:51   10  is about getting a good yield of that starting material.

:03:54   11  That is what this is in reference to.

:03:58   12              Maybe there is some way to read this where you

:04:01   13  can say, well, this is connected to the salts.  But we

:04:03   14  submit that this and the following description, which is a

:04:07   15  description of the method of making one species of that

:04:11   16  compound, which is fesoterodine fumarate, is being

:04:16   17  described.

:04:16   18              The fact that it is crucial and special is quite

:04:20   19  different than saying it is required or I am excluding all

:04:22   20  other processes.  It is just saying, look, it is important

:04:25   21  that you do it if you want to get a high yield of these

:04:28   22  intermediates.  It is important that you follow this,

:04:30   23  because, depending on how you do the synthesis, you might

:04:34   24  get a lower yield, you might get some salts that are oily in

:04:36   25  form, you might get some salts that are amorphous.  And that

:04:41    1    really is of no consequence, because those salts, however

:04:45    2    impractical they are relative to highly pure crystalline

:04:49    3    salts, they are still covered by Claim 1.  That is still the

:04:52    4    intellectual property of this inventor.

:04:55    5         So I don't think that this is as remarkable as

:04:58    6    defendants suggest it is.

:04:59    7         In addition, Your Honor, what the defendants cut

:05:01    8    out from that passage in their briefing is the very next

:05:06    9    sentence.  The very next sentence says, "This is explained

:05:10   10    using Reaction Diagram 1," or Figure 1, on the face of the

:05:14   11    patent, "in which the conversions with R-configured

:05:17   12    compounds are described."  This is the racemate form of the

:05:22   13    glycemic, the enantiomer form of the genus of compounds.

:05:23   14         But it concludes very clearly, but without this

:05:26   15    being restrictive, without this being restrictive, this

:05:29   16    language that is diametrically opposed to language of clear

:05:35   17    exclusion, of manifest exclusion of the claim scope or

:05:39   18    disavowal of claim scope, that is not anywhere in the

:05:42   19    ballpark of an exclusion.  And the inventor expressly carved

:05:47   20    that out.

:05:50   21         The only other place where "special reaction

:05:53   22    process" is referenced in the '650 patent is up front, right

:05:56   23    at the bottom of Column 1, where the inventor claimed it in

:06:02   24    the background of the invention.  We have highlighted the

:06:02   25    portions of the specification here and I have blown them up.

:06:05   1       At the top, the figure that has been blown up at

:06:09   2   the top of the slide here, that is Formula A.  Formula A is

:06:12   3   a reference throughout the patent.  What Formula A is, it is

:06:16   4   the free-base form.  This is the base compound for making

:06:20   5   the salts.  Again, very different compound than the salt

:06:25   6   itself.  This compound, there are many observations

:06:27   7   discussed about the stability of this compound.  Be that as

:06:30   8   it may, you need this compound to ultimately make the salts.

:06:34   9   So you need to be able to make it and you need to be able to

:06:37   10  make it with relative efficiency.

:06:40   11      That aside, the other reference to special

:06:43   12  reaction process described at the bottom of this column --

:06:46   13  and we can zero in here, it's been blown up --

:06:49   14  "Surprisingly, it has now been found that the

:06:52   15  above-mentioned disadvantages can be avoided if compounds

:06:54   16  with the structure of general Formula A, once they have been

:06:57   17  prepared under a special reaction process, are converted

:07:01   18  with a physiologically compatible inorganic or organic

:07:04   19  acid..."

:07:05   20      So it couldn't be more clear from this passage

:07:08   21  that the inventor is connecting the special reaction process

:07:12   22  to the free base, to the base compound, to the starting

:07:16   23  material, not to the salt.  That compound is separately

:07:19   24  claimed, as we saw already.  That compound in and of itself

:07:22   25  is an invention.  An improved method for making that

:07:26    1    compound is disclosed and disclaimed.

:07:29    2         The reference to special reaction process

:07:32    3    disconnected from the salt is at least not directly

:07:36    4    connected, and specifically refers to the free-base compound

:07:38    5    here, which is not the subject of Claim 1.

:07:47    6         Finally, the courts look to the prosecution

:07:50    7    history if it is in evidence.  And very simply, what the

:07:53    8    courts are looking for in these disavowal cases or these

:07:57    9    conversion to product-by-process cases are instances where

:08:00   10    an applicant is distinguishing prior art upon rejection and

:08:07   11    that distinguishing of the prior art is necessarily carving

:08:11   12    out some of the claim scope that the claim might otherwise

:08:16   13    be read to have.  That has not occurred in this case, and

:08:19   14    for good reason.

:08:23   15         The prosecution history of Claim 1 is relatively

:08:28   16    uneventful here.  This is shown in the slide.  There was one

:08:33   17    office action, and there was no rejection of that claim over

:08:36   18    any prior art.  In fact, the only rejection that was made

:08:43   19    was a provisional double-patenting rejection over the

:08:47   20    co-pending, co-owned application that the prior art document

:08:55   21    for the compound patents, that is, the U.S. version of that

:08:59   22    212 PCT.

:09:01   23         Far from being prior art and being rejected as

:09:04   24    prior art by the Patent Office, the Patent Office recognized

:09:07   25    that it was not prior art, and therefore made a provisional

| | | |
|---|---|---|
| :09:13 | 1 | double-patenting rejection which the applicant overcame with |
| :09:16 | 2 | a terminal disclaimer, and the claim was allowed. |
| :09:20 | 3 | So every case that the defendants cite has |
| :09:25 | 4 | facts, in terms of disavowal, they have facts where the |
| :09:28 | 5 | applicants were distinguishing prior art and the disavowal |
| :09:30 | 6 | was commensurate with the distinction over the prior art. |
| :09:34 | 7 | Anderson, Astra, C.R. Bard, SciMed, Verizon, all those cases |
| :09:40 | 8 | have that fact. |
| :09:41 | 9 | By contrast, in this case, we never had any |
| :09:43 | 10 | rejection over the prior art.  We therefore never |
| :09:46 | 11 | distinguished over any prior art, and thus didn't even have |
| :09:49 | 12 | the occasion to disavow by virtue of some argument to |
| :09:53 | 13 | distinguish prior art. |
| :09:55 | 14 | Those facts are not here. |
| :10:00 | 15 | In summary, Your Honor, there are three |
| :10:02 | 16 | inventions here, separately disclosed, separately claimed, |
| :10:07 | 17 | one of which is the salt compounds, and those are the salt |
| :10:10 | 18 | compounds of Claim 1. |
| :10:11 | 19 | The intrinsic evidence, as we just went through, |
| :10:14 | 20 | is completely devoid of any suggestion that there was a |
| :10:17 | 21 | disavowal or that a conversion to a product-by-process claim |
| :10:21 | 22 | is appropriate. |
| :10:21 | 23 | And I just want to reiterate that the fact that |
| :10:26 | 24 | the defendants' argument rests on a supposed process, the |
| :10:32 | 25 | salts being disclosed in the prior art, there is no prior |

:10:34    1   art.   The reference that they allude to in their briefing is

:10:39    2   not prior art as a matter of law.   And that is important,

:10:41    3   because the Vanguard decision by the Federal Circuit is

:10:44    4   really on point here when it comes to taking a standard

:10:47    5   product or compound claim and attempting to convert it to a

:10:51    6   product by process.

:10:52    7          The defendants only distinguish that case by

:10:53    8   saying, the difference with that case is that those claims,

:10:58    9   the subject matter of those claims was actually novel.   So

:11:02   10   the implication is these salts are not novel.   But, in fact,

:11:05   11   they are novel, and there is no prior art.

:11:08   12          That is all I have, Your Honor.   Thank you very

:11:11   13   much.

:11:12   14          THE COURT:   Thank you, counsel.

:11:18   15          MR. DZWONCZYK:   Your Honor, I also have some

:11:29   16   slides.   May I approach?

:11:31   17          THE COURT:   Yes.

:11:42   18          MR. DZWONCZYK:   Your Honor, as the plaintiffs --

:11:46   19          THE COURT:   Counsel, remind of your name.

:11:47   20          MR. DZWONCZYK:   Mike Dzwonczyk from the Sughrue

:11:52   21   Mion firm.   I am here for Accord and Amneal, but speaking on

:11:55   22   behalf of all the defendants on the claim terms set forth,

:11:57   23   except for Hetero and Hetero Labs.

:12:01   24          As the plaintiffs state, Your Honor, this case

:12:05   25   pertains to fesoterodine fumarate.   It is a drug to treat

:12:06   1    overactive bladder.  Before getting right to our claim

:12:10   2    construction points, I would like to spend a minute or two

:12:14   3    talking about the background of this patent, what happened

:12:16   4    before, because I think it will help better understand the

:12:19   5    defendants' position.

:12:21   6            Prior to this patent, a drug called tolterodine

:12:24   7    was used to treat overactive bladder.  It was commercially

:12:28   8    marketed, patented, and hadn't been discovered.  After a

:12:31   9    patient took tolterodine, it was discovered and reported in

:12:35   10   the literature that tolterodine was metabolized by a patient

:12:38   11   to its active form called 5-HMT, 5-hydroxymethyl

:12:46   12   tolterodine.  That means a patient, after taking

:12:49   13   tolterodine, would actually add the hydroxyl group onto the

:12:52   14   molecule and form in-vivo the more active form.

:12:58   15           But tolterodine had certain drawbacks.  The

:13:00   16   biggest drawback was that certain patients taking

:13:04   17   tolterodine metabolized tolterodine at different rates.

:13:07   18           So in extensive metabolizers, 5-HMT was formed

:13:12   19   rather quickly, and a high amount of the drug got to the

:13:15   20   active site, the muscular receptors and bladder.  In poor

:13:20   21   metabolizers, the drug was actually metabolized more slowly,

:13:23   22   as tolterodine became bound up with plasma proteins.  So a

:13:27   23   smaller amount of the drug would effectively get to the

:13:29   24   active site.

:13:30   25           The problem with the prior art tolterodine was

:13:33    1    inter-patient variation.  Different patients would actually

:13:37    2    tolerate the drug differently, and depending on what kind of

:13:41    3    metabolizer you were, you actually might get a different

:13:43    4    amount of the active form to the site.

:13:47    5           The challenge became how to get the active form

:13:50    6    5-HMT to the active site of a patient.  The most immediate

:13:54    7    solution was to simply administer it directly.  I think

:13:58    8    scientists recognized and the literature reported that 5-HMT

:14:02    9    was extremely hydrophilic.  It was very water-soluble.  As

:14:06   10    such, it couldn't permeate biological membranes very easily.

:14:12   11    It simply would get passed through.

:14:13   12           So the challenge became how to take the active

:14:17   13    metabolite, 5-HMT, and get it to the active site of the

:14:21   14    patient.

:14:22   15           So researchers began working on certain ways to

:14:26   16    do that.  And the '650 patent tells us that prodrugs of

:14:29   17    5-HMT were made.

:14:31   18           Prodrugs are precursors, actively metabolized --

:14:36   19    I don't mean to go into that very extensively.

:14:38   20           As a result of that work, a number of prodrugs

:14:41   21    or precursors of 5-HMT were prepared, one of which was

:14:48   22    fesoterodine.  What happens after a patient takes

:14:51   23    fesoterodine, which is much more lipophilic than 5-HMT, the

:14:56   24    body essentially cleaves off the isobutyl portion and 5-HMT

:15:02   25    will result.

:15:06   1      Fesoterodine is an ester derivative of 5-HMT.

:15:09   2   It is converted.  But to be clear, the prodrugs, including

:15:13   3   fesoterodine, they are not the subject of the '650 patent.

:15:16   4   The plaintiffs tell us it's the salt.  And that's where we

:15:19   5   begin our analysis.

:15:23   6      The compounds are called

:15:24   7   3,3-diphenylpropylamines because the core of general Formula

:15:30   8   I is a propyl amine, three carbon units with an amine or an

:15:34   9   NH group on the end.  The carbons are numbered, 1, 2, and 3.

:15:38   10  And we see attached to Carbon No. 3 two phenyl groups.  And

:15:42   11  that's why these compounds are called

:15:44   12  3,3-diphenylpropylamines.  That is what is claimed, this

:15:48   13  general salt structure, in Claim 1, and that is fairly

:15:51   14  straightforward.

:15:53   15     On its face the defendants agree, there is

:15:55   16  nothing unclear about the language of Claim 1.  But this is

:15:59   17  claim construction.  It's not statutory construction.  So we

:16:02   18  have to look at the intrinsic evidence, as Your Honor is

:16:05   19  aware.

:16:06   20     If we look at the very first page of the patent,

:16:09   21  we find the title and abstract.  The title tells us we have

:16:14   22  stable salts of novel derivatives of

:16:16   23  3,3-diphenylpropylamines.  They are highly pure, they are

:16:20   24  crystalline, et cetera.

:16:21   25     The abstract also tells us that the stable

:16:25  1   crystalline intermediates are essential for obtaining the

:16:29  2   compounds of the invention.  Before we even turn the page,

:16:33  3   we are told about the highly stable crystalline nature of

:16:36  4   the claimed compounds and the essential nature of the

:16:39  5   intermediates used to obtain them.  Just to make sure we

:16:42  6   understand that, the patentees go on, right in Column 1, and

:16:46  7   tell us the exact same thing.  These are salts of compounds

:16:50  8   and they are highly pure and stable.

:16:54  9           In Column 1, the patentees go on a little

:16:56  10  further and they tell us about what was known.  When they

:16:59  11  use the word known, they are talking about what went before.

:17:03  12  What they say is, from document PCT, the 212 document, novel

:17:09  13  derivatives of 3,3-diphenylpropylamines are known.  If one

:17:13  14  looks at the WO publication of the PCT application, right at

:17:20  15  Page 11, we see a description that says, "Particularly

:17:23  16  preferred phenolic monoesters are," and fesoterodine is

:17:27  17  listed.

:17:28  18          Elsewhere in the patent, it says the compounds

:17:30  19  of the invention can be formed of free bases and their

:17:35  20  salts.  Elsewhere in the patent -- I have not illustrated it

:17:38  21  on the slide -- is an actual production of the recorded

:17:41  22  synthesis of fesoterodine hydrochloride, which is a salt.

:17:44  23  The patentees say, this is known, and because it's known,

:17:48  24  it's not part of the '650 patent claims.

:17:53  25          The patentees go on in Column 1 and they say,

:17:57   1   "Preferred are the known compounds according to Formula A

:18:00   2   substituted as shown."

:18:01   3          It then talks about the fact that the preferred

:18:05   4   known compounds, the 3,3-diphenylpropylamines and whatever

:18:10   5   else is disclosed in the PCT application, have certain

:18:14   6   disadvantages.  For example, in Column 1, Lines 47 to 62,

:18:20   7   the patent tells us the known compounds have low water

:18:24   8   solubility.  They have restricted oral bioavailability.  The

:18:29   9   monoesters undergo intermolecular rearrangement, they

:18:31   10   degrade, they form diols, et cetera.

:18:35   11          The '650 patent then tells us that salts of the

:18:39   12   known compounds can be obtained but they can be amorphous or

:18:42   13   hygroscopic or too chemically unstable to form

:18:46   14   pharmaceutical compounds.

:18:48   15          Quite simply, because all of these compounds are

:18:51   16   known and they all have stated disadvantages, they are not

:18:55   17   part of the '650 patent claims.

:18:58   18          We then get to the bottom of Column 1 of the

:19:00   19   '650 patent, where the patent says, "Surprisingly, it has

:19:07   20   now been found that all these disadvantages can be avoided

:19:10   21   if the known compounds, general Formula A, are prepared

:19:13   22   under a special reaction process and then converted to a

:19:17   23   salt."

:19:20   24          The special reaction process is used to make

:19:23   25   compounds of general Formula A.

| | | |
|---|---|---|
| :19:25 | 1 | I think counsel referred to those as the |
| :19:27 | 2 | free-base form but not the salted form.  But there is |
| :19:31 | 3 | nothing in the patent that says the special reaction process |
| :19:35 | 4 | includes the last step, salt formation.  And that is the |
| :19:39 | 5 | reason defendants have not proposed salt formation as part |
| :19:43 | 6 | of its claim construction, because the patent tells us that |
| :19:46 | 7 | only making the intermediate general Formula A is made by |
| :19:50 | 8 | the special process. |
| :19:52 | 9 | Moving along, following that disclosure of |
| :19:55 | 10 | surprisingly, the '650 patent then tells us, and summarizes |
| :20:00 | 11 | the three known compounds the claimed subject matter is |
| :20:05 | 12 | intended to address, to provide highly pure crystalline |
| :20:09 | 13 | compounds, to provide a method of manufacturing stable |
| :20:13 | 14 | intermediates, and to provide a method of manufacturing in |
| :20:17 | 15 | high-yield chemo- or regioselectivity. |
| :20:20 | 16 | Again, they tell us that problem is solved by |
| :20:22 | 17 | providing the stable crystalline compounds of general |
| :20:25 | 18 | Formula I. |
| :20:26 | 19 | If we compare just using the first two columns |
| :20:29 | 20 | of the '650 patent, if we compare what is stated to be known |
| :20:33 | 21 | and compare that to what is claimed, what we find is that |
| :20:40 | 22 | 3,3-diphenylpropylamines were known both as neutral forms as |
| :20:44 | 23 | well as salts with physiologically compatible acids.  After |
| :20:49 | 24 | all, fesoterodine and racemic fesoterodine are said to be |
| :20:52 | 25 | known.  They are in the PCT application. |

:20:54    1          What is claimed in the '650 patent are the

:20:56    2    3,3-diphenylpropylamine compounds only as salts.  The known

:21:02    3    compounds are said to be disadvantageous.  The claimed

:21:06    4    compounds were said to be advantageous.

:21:09    5          So there has to be a difference between what is

:21:11    6    being claimed and what the patentees tell us is already

:21:13    7    known.  Of course, the patentees tell us exactly what the

:21:17    8    difference is between what is claimed and what went before

:21:20    9    it.

:21:21   10          In Column 9, they say, "In order to obtain the

:21:24   11    compounds in accordance with the invention in the form their

:21:27   12    salts the special reaction process via intermediate stages

:21:32   13    and individually identifiable intermediate products is

:21:34   14    crucial."

:21:36   15          First and foremost, this disclosure says

:21:39   16    compounds of the invention.  That means all compounds of the

:21:42   17    invention.  They are not talking about selective embodiments

:21:45   18    or certain subclasses of compounds.  It is a general

:21:49   19    statement as to the compounds of the invention as a whole.

:21:52   20          It's akin to statements such as, "The present

:21:55   21    invention is."

:21:57   22          The statement then talks about the special

:22:00   23    reaction process via particular intermediate stages, et

:22:04   24    cetera.  Special is a word chosen by the patentee.  It means

:22:07   25    not conventional or routine, but not something left to the

:22:10    1    knowledge of a person of ordinary skill, but something of

:22:13    2    greater significance.

:22:15    3             The patentee talks about particular intermediate

:22:18    4    stages and individually identifiable compounds.  That

:22:21    5    doesn't mean any intermediates which might be transient or

:22:25    6    not characterized.  They are very particular about what the

:22:28    7    special reaction process is.

:22:30    8             Of course, finally, of course, it has been much

:22:32    9    briefed and much spoken about, the use of the word crucial

:22:35   10    at the end of the sentence.  Obviously, crucial is not a

:22:38   11    common word that is found in patents.  We believe crucial

:22:42   12    conveys something to the reader that is critical and

:22:45   13    imperative, and in its use here suggests to defendants or

:22:47   14    should tell the person of ordinary skill in the art that the

:22:50   15    reaction process used to obtain the compounds of the

:22:56   16    invention are critical and imperative.

:22:58   17             Now, the patentees could have said that the

:23:02   18    process and the particular intermediates used to make them

:23:04   19    were desirable or advantageous or beneficial.  But they

:23:09   20    didn't say that.  They could have said the process steps

:23:11   21    were preferred or highly preferred or more preferred.  They

:23:14   22    didn't say that, either.  They could have even said

:23:17   23    important, or fundamental.  But they used the word crucial.

:23:21   24    And defendants submit that that language simply can't be

:23:24   25    ignored in deciding what compounds are within the scope of

:23:28     1    the claims.

:23:30     2              We have talked a lot about the special reaction

:23:33     3    process.  I would like to walk through that briefly.

:23:44     4              Figure 1 of the '650 patent illustrates the

:23:48     5    reaction steps by which the claimed salts are made.

:23:52     6    Beginning with the starting material, it is designated No. 3

:23:56     7    in Figure 1, Compound 3 has to be made and the '650 patent

:24:01     8    tells people how to make it.

:24:03     9              Beginning with Compound 3, Figure 1 shows us how

:24:06    10    to get to Compound 6, which is an intermediate en route to

:24:11    11    the claimed salts.  And Figure 1 tells us you can take one

:24:14    12    of two pathways.  You can either begin with Compound 3, and

:24:18    13    reduce first and then hydrogenate, or you can carry out

:24:21    14    those steps in the reverse order, you can hydrogenate and

:24:25    15    then reduce.  Either way, one obtains Compound 6 as a result

:24:31    16    of the reaction process.

:24:35    17              After one obtains Compound 6, necessary to all

:24:40    18    of the productions or syntheses disclosed in the patent is

:24:44    19    an acylation step followed by salt formation.

:24:49    20              The patent tells us that the first three of

:24:51    21    these steps are crucial -- again, this is from the bottom of

:24:56    22    Column 1 -- but that the fourth step, salt formation, is not

:25:01    23    crucial.  It is telling that every one of the examples in

:25:03    24    the '650 patent follows this special reaction pathway in

:25:07    25    Figure 1.  I think it's equally telling that there is no

:25:11    1    disclosure in the patent of any other ways to make the

:25:14    2    compounds of general Formula A.

:25:18    3                So much for the patent disclosure.

:25:20    4                The prosecution history, admittedly, there was

:25:22    5    not much.  There was a single office action.  It was

:25:26    6    responded to, and the patent was allowed.

:25:28    7                Interestingly, after the patent was issued, the

:25:30    8    patentees filed a certificate of correction to the language

:25:33    9    of the patent.  The original language of the patent stated

:25:36    10    that "Compounds of general Formula I are that," and A, B, C,

:25:43    11    D were the four reaction steps used to make them.  They

:25:48    12    corrected that language to say, "Compounds of general

:25:51    13    Formula I are manufactured in that," and then the four

:25:54    14    reaction steps followed.

:25:56    15                Interestingly, the patentee doesn't say those

:26:00    16    four steps, the compounds are preferably manufactured or

:26:03    17    typically manufactured.  They said in the certificate of

:26:07    18    correction:  They are manufactured in the four process

:26:11    19    steps.

:26:13    20                On this record, Your Honor, both the patent

:26:17    21    language and the language of the prosecution history, we

:26:19    22    submit it is hard to imagine a clearer case for construing

:26:22    23    Claim 1 as encompassing only those compounds that are made

:26:31    24    by the crucial reaction process of the selected

:26:33    25    intermediates.

:26:34    1         But that is what the patent tells us.  That's

:26:37    2    what the patent said.  And that is how defendants submit

:26:41    3    Claim 1 should be construed.

:26:42    4         I would like to address just a couple of

:26:44    5    comments made by plaintiffs in their briefs.

:26:48    6         Plaintiffs said that we completely misread

:26:51    7    disclosure.  They told the Court that the word crucial bears

:26:55    8    no connection to the claimed compounds.  They further

:26:58    9    explain that crucial and special relate to the methods of

:27:04    10    manufacturing as a separate group of claimed inventions.

:27:07    11    But they are beside the point as to the product claims.

:27:10    12         With respect, Your Honor, we submit their

:27:13    13    arguments are without merit.  Quite simply, if one reads the

:27:17    14    disclosure of Column 9, it says, "In order to obtain the

:27:20    15    compounds in accordance with the invention, the special

:27:23    16    reaction process is crucial."

:27:25    17         That passage doesn't say, In order to perform

:27:28    18    the method of manufacturing of the invention, the special

:27:32    19    process steps are crucial.

:27:33    20         It says, "The process is crucial for obtaining

:27:36    21    the claimed compounds."

:27:37    22         And so we submit that "crucial" absolutely is a

:27:41    23    description of the process steps required to make the

:27:44    24    compounds.

:27:46    25         I understand plaintiffs don't like the word

:27:48    1    crucial in this patent.  But I think it's incorrect for them

:27:51    2    to say it bears no relation to the compounds that are

:27:54    3    claimed in Claim 1.

:27:56    4         A second argument plaintiffs have made is that

:28:00    5    the reaction process of the '650 patent is a preferred

:28:04    6    embodiment, not necessary, it's preferred, and it doesn't

:28:07    7    limit the claims.  But the patentees, in the actual

:28:12    8    specification, don't call the reaction process preferred,

:28:15    9    Your Honor.  They call it crucial.

:28:18   10         The patentees certainly knew the difference

:28:20   11    between the two words, because they used preferred to

:28:22   12    describe compounds of intermediates, but never in connection

:28:26   13    with any process steps.  The plaintiffs don't cite to

:28:29   14    anything in the language of the patent downgrading the

:28:32   15    crucial nature of the process steps to one that is only

:28:35   16    preferred, because preferred is never used in connection

:28:39   17    with the process.

:28:47   18         Next, plaintiffs talk about the fact that

:28:50   19    defendants are trying to convert Claim 1 into a

:28:53   20    product-by-process claim.  And it's our position that we are

:28:57   21    not, Your Honor.  On its face, Claim 1 is a product claim.

:29:00   22    Plaintiffs say there is no process steps limiting the

:29:04   23    language in Claim 1 on its face.  And we agree.

:29:07   24         They say that none of the language typically

:29:10   25    signaling a process claim -- or a product-by-process claim

:29:14   1   appears in Claim 1.  And we agree with that as well.

:29:17   2          It is our position that Claim 1 is a product

:29:20   3   claim whose literal scope is narrower than the words of the

:29:25   4   claim would otherwise suggest based on the language in the

:29:29   5   specification, basic lexicography, where the patentee tells

:29:33   6   us what we have to do to get the compounds of Claim 1.

:29:37   7          But that doesn't make Claim 1 a

:29:40   8   product-by-process claim.  As the plaintiffs have pointed

:29:44   9   out, product-by-process claims are typically reserved for

:29:48   10  those products that can't be described or otherwise claimed

:29:51   11  other than by which the method they were made.  That is not

:29:54   12  the position we are taking here.

:29:57   13         In product-by-process claims, the products

:30:01   14  themselves are novel.  We don't concede that the products of

:30:04   15  Claim 1 are novel.

:30:07   16         In product-by-process claims, the process

:30:11   17  limitations serve as limitations for purposes of

:30:16   18  infringement but not validity.  Again, we are not arguing

:30:18   19  any of that.  We are not taking that position.

:30:21   20         What they rely on for saying that the process of

:30:25   21  the '650 patent is non-restrictive is a disclosure that they

:30:29   22  showed Your Honor a little bit earlier in Column 9.

:30:37   23  Referring to Figure 1, we have our language talking about

:30:41   24  the crucial reaction process.  In the next paragraph, Column

:30:46   25  9, it says, This is explained using reaction diagram Figure

:30:49    1    1 in which conversions with R-configured compounds are

:30:54    2    described but without this being restrictive.

:30:57    3         We submit that that last portion of not being

:31:02    4    restrictive, Your Honor, it's not a statement that the

:31:04    5    process steps can be varied.  It's a statement that that

:31:08    6    process shown in Figure 1 isn't limited to the R-configured

:31:13    7    compounds that are shown.  If we look at Figure 1, they are

:31:16    8    all isomeric.  They all show R-configured compounds.  And as

:31:20    9    proof of this point, we have only to look at Claim 1.  Claim

:31:24    10   1 is not directed solely to the R-plus compounds.  It is

:31:27    11   directly to the R and the S and the racemic.

:31:31    12        We submit that this statement is no more than

:31:34    13   perhaps supporting disclosure for the breadth of Claim 1

:31:37    14   which includes R, S, and racemic.  But we don't read this

:31:41    15   statement as saying these process steps can be varied.

:31:48    16        Plaintiffs also make some arguments about claim

:31:50    17   differentiation, Your Honor.  And they say that in their

:31:53    18   opening brief at Page 11 and 12.  They, of course, say, if

:31:58    19   the Court adopts defendants' proposed construction, the

:32:02    20   doctrine of claim differentiation would be frustrated or

:32:06    21   violated.  We have Claim 1 and 7 covering the same material.

:32:10    22   We absolutely disagree, for a couple of reasons.

:32:13    23        First, the only process limitations, the only

:32:16    24   process features defendants believe are part of Claim 1 are

:32:19    25   Steps 1 through 3.

:32:21    1          The fourth step, salt formation, is not part of

:32:26    2     defendants' construction.  To be clear, the salt formation

:32:28    3     step is part of Claim 7.  So even if Your Honor were to

:32:32    4     adopt defendants' construction, Claims 1 and 7 would at

:32:34    5     least be different by recitation in Claim 7 of the salt

:32:38    6     formation step.

:32:41    7          Second, in defendants' proposed construction, as

:32:44    8     was shown in the figure, the first two steps can be carried

:32:47    9     out in either order.  Hydrogenation first, then followed by

:32:52   10     reduction, or in reverse.  In contrast, Claim 7 always

:32:56   11     requires that the hydrogenation step occur first and

:32:59   12     reduction second, not in the reverse order.

:33:02   13          Again, a second reason why, even if Your Honor

:33:06   14     adopts defendants' construction, Claims 1 and 7 will always

:33:09   15     be differentiated.

:33:14   16          A final point I would like to address, Your

:33:17   17     Honor, the plaintiffs say that defendants' proposed

:33:20   18     construction is nonsensical and inconsistent because we

:33:26   19     omitted the fourth step from our proposed construction, we

:33:28   20     omitted the salt formation step.  But in making that

:33:31   21     argument, plaintiffs concede in their opening brief that all

:33:35   22     four Steps A through D are necessary to obtain the claimed

:33:41   23     compounds in the salt form.

:33:42   24          To be clear, defendants agree that all four

:33:44   25     steps are necessary.  But we only propose the first three as

:33:51   1   limitations affecting the compounds of Claim 1 because

:33:54   2   that's what the patentee tells us.  He doesn't tell us that

:33:57   3   Step 4, the salt formation step, is special or couldn't be

:34:02   4   left to the knowledgeable person of ordinary skill in the

:34:04   5   art.

:34:05   6        We submit that our proposed construction is not

:34:08   7   incomplete because we omitted that fourth step.  Process

:34:12   8   claims, product-by-process claims, aren't required to recite

:34:16   9   every step in a process.  In a multi-step process less than

:34:20   10   all of the steps can be claimed.  That is fairly well known.

:34:23   11        I would point out, I believe there is an

:34:25   12   inconsistency with plaintiffs saying that the four specific

:34:30   13   steps, A through D, are necessary to obtain the compounds in

:34:35   14   the salt form.  But elsewhere they say that the four

:34:40   15   specific steps are only exemplary.  They are preferred.  And

:34:44   16   that they are non-restrictive.  They don't limit the claims.

:34:48   17   I am not sure how those two approaches are consistent.

:34:53   18        But I guess I would close by saying that on this

:34:56   19   record, Your Honor, given the language of the patent and the

:34:59   20   prosecution history, and the plaintiffs' recognition that

:35:02   21   the four steps are necessary, it is clear that the claimed

:35:06   22   compounds are differentiated by those that were known in

:35:09   23   Column 1, 3,3-diphenyldiphenylproplyamines, only based on

:35:14   24   the reaction process used to make them.

:35:16   25        As plaintiffs have said, there is nothing in the

:35:18    1    claims that talk about stability or crystallinity or

:35:21    2    anything else.  So the process steps are really the only

:35:25    3    difference.

:35:26    4             That's all I have, Your Honor.

:35:28    5             THE COURT:  Okay.  Thank you, counsel.

:35:33    6             Plaintiff, brief reply.

:35:35    7             MR. TRAINOR:  Very briefly, Your Honor.

:35:40    8             I am not sure that any of what we pointed out in

:35:43    9    our argument was actually responded to there.

:35:47   10            What I think was most telling is, we went

:35:49   11    through a whole lot of description on the specification of

:35:54   12    not this patent but primarily of other documents.  And one

:35:57   13    thing we didn't see was the words of the claim.  We didn't

:35:59   14    see Claim 1 up there, which is where you start with claim

:36:02   15    construction.  That is black-letter patent law.

:36:05   16            With respect to the argument of claim

:36:08   17    differentiation, and it sort of ties into a point that we

:36:11   18    made in our opening, I think we are all in agreement that

:36:14   19    all four steps are required to make a salt.  And the

:36:17   20    defendants are suggesting our construction leaves out that

:36:21   21    fourth step.  I didn't understand that when we read the

:36:24   22    briefs.  I don't understand it now.

:36:26   23            Claim 1 is to a salt.  Claim 1, we put it on the

:36:31   24    screen, is to a compound in a salt form.

:36:35   25            To take the position that we agree, you need to

:36:38    1   have all four steps to make a salt, and in the proposed

:36:42    2   construction it leaves off the salt formation step, you are

:36:45    3   necessarily left with a claim that had issued and was

:36:48    4   directed to a salt as issued from the Patent Office but

:36:50    5   under this construction is no longer a salt.  And that

:36:53    6   cannot be the proper construction.

:36:55    7          The other thing I would just point out, Your

:36:57    8   Honor, we heard a lot about what is known and this was known

:37:00    9   and that was known.  3,3-diphenylpropylamines, of course,

:37:04   10   they were known.  As a class of compounds, they have been

:37:06   11   known since the beginning of the 20th century, if not

:37:09   12   earlier.

:37:10   13          The few references to the more specific genus of

:37:15   14   the monoesters being known, that is a reference to the

:37:17   15   inventors' own co-pending application.  It was not known in

:37:20   16   the prior art.  It is not prior art.  We have heard no

:37:22   17   argument as to why we are incorrect that that document in

:37:26   18   any disclosure about these salts, any disclosure about the

:37:30   19   processes, is prior art.

:37:31   20          In fact, when you really think about that

:37:33   21   argument, and we hear about these properties and these are

:37:35   22   the problems with tolterodine and these are the problems

:37:39   23   with the 5-HMT, all of that sort of smacks of an argument on

:37:42   24   the merits of invalidity, that this claim should not have

:37:46   25   issued because these things were not known about the

| | | |
|---|---|---|
| :37:49 | 1 | compounds. |
| :37:50 | 2 | That is not an issue for claim construction. |
| :37:51 | 3 | The question is whether there is sufficient structure in |
| :37:54 | 4 | this claim that should be left as is and would be understood |
| :37:57 | 5 | by a person of ordinary skill in the art. |
| :37:59 | 6 | Thank you, Your Honor. |
| :38:00 | 7 | THE COURT:  Thank you. |
| :38:02 | 8 | Hold on just a second. |
| :38:02 | 9 | (Pause.) |
| :38:10 | 10 | All right.  Counsel, is there anything we should |
| :38:14 | 11 | discuss while we have you all here?  Is everything going |
| :38:16 | 12 | along smoothly?  Do we need to address anything while we are |
| :38:20 | 13 | together? |
| :38:20 | 14 | Wonderful.  Safe travels. |
| :38:22 | 15 | (Hearing concluded at 10:37 a.m.) |
| :38:22 | 16 | -   -   - |
| :38:22 | 17 | Reporter:  Kevin Maurer |